**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

EDGAR DIAZ,

      **Plaintiff,**

v.

ANTHONY WILLS, JESSE RUCH,
JOHN ALEXANDER, MAJOR GEE, DR.
MARY WILSON, ERIN NICHOLSON,
CARRI MORRIS, SANDY WALKER,
CURTIS DALLAS, ANTHONY JONES,
JOHN DOE #1, and MARC
WILDHABER,

      **Defendants.**

Case No. 26-cv-225-RJD

## MEMORANDUM AND ORDER

**DALY, Magistrate Judge:**

Plaintiff Edgar Diaz, an inmate of the Illinois Department of Corrections who is currently incarcerated at Pontiac Correctional Center, brings this action pursuant to 42 U.S.C. § 1983 for deprivations of his constitutional rights at Menard Correctional Center. In the Complaint, Diaz alleges several constitutional violations against multiple staff members at Menard. He raises claims under the Eighth and Fourteenth Amendments.

This case is now before the Court for preliminary review of the Complaint pursuant to 28 U.S.C. § 1915A.[1] Under Section 1915A, the Court is required to screen

---

[1] The Court has jurisdiction to screen the Complaint in light of Plaintiff's consent to the full jurisdiction of a Magistrate Judge, and the limited consent by the Illinois Department of Corrections and the medical providers, to the exercise of Magistrate Judge jurisdiction as set forth in the Memoranda of Understanding between this Court and these entities.

1

prisoner complaints to filter out non-meritorious claims. *See* 28 U.S.C. § 1915A(a). Any portion of a complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or asks for money damages from a defendant who by law is immune from such relief must be dismissed. 28 U.S.C. § 1915A(b).

## The Complaint

Diaz is designated a seriously mentally ill ("SMI") inmate (Doc. 1, p. 6). In early April 2024, his family started contacting staff at Menard requesting a wellness check due to a deterioration in his mental health (*Id.*). On April 7, 2024, the inmate in the next cell suggested that Diaz request a crisis team and stopped a correctional officer, informing the officer that Diaz needed help (*Id.*). Diaz also asked the officer for a crisis team, but the officer replied that he should not do that unless "you're hanging." (*Id.*).

On August 8, 2024, Diaz made multiple requests to Correctional Officer ("C/O") John Alexander for a crisis team or mental health personnel for his condition (Doc. 1, p. 6). Each time, Alexander refused the request (*Id.*). Diaz asked for grievances and the names of individuals who refused his requests for care (*Id.*).

Later that same day, Alexander and Sergeant Jesse Ruch approached Diaz's cell and directed him to cuff up because he was going to segregation (Doc. 1, p. 6). Ruch tightened the cuffs as tight as possible and hit Diaz's hands while they were in the restraints (*Id.*). He also squeezed Diaz's groin and made inappropriate comments (*Id.*).[2] Diaz was escorted to restrictive housing, strip searched, "further attacked", and placed

---

[2] Diaz does not describe the nature of these comments, only noting that they were inappropriate.

in a cell with feces, blood, and waste covering the cell (*Id.*). The only item in the cell was a mattress (*Id.*).

Diaz informed all officers that walked past his cell about the conditions he faced and his physical pain (Doc. 1, p. 6). He informed staff that he lacked access to running water and had no way to wipe when using the restroom (*Id.*). He only had a smock and a mattress (*Id.*).

On April 10, 2024, Marc Wildhaber approached his cell and noted that Diaz had been attacking staff (Doc. 1, p. 6). He then sprayed a chemical agent into the cell at Diaz (*Id.*). Wildhaber then took him to another bullpen in the unit and he and other staff attacked Diaz (*Id.*). Wildhaber then returned Diaz to the cell without first allowing him to wash off the chemical spray (*Id.*). The cell still contained the chemical spray, and his mattress was taken out of the cell (*Id.*).

Diaz alleges that he remained in this cell from April 8 through April 18 (Doc. 1, p. 7). During his time in the cell, Diaz was seen by mental health staff including Carri Morris, Dr. Mary Wilson, and Erin Nicholson (*Id.*). Diaz informed the staff members that he was in physical pain (*Id.*). He suffered from swollen hands and was still covered in the chemical spray (*Id.*). He requested to decontaminate (*Id.*). Nicholson acknowledged that Diaz wanted to wash off the spray, but she refused to help him. On April 18, 2024, Diaz was removed from crisis watch and moved to another cell. But he was not allowed to wash until May 3, 2024 (*Id.*). Diaz alleges that Officer Bent refused his requests to shower because he was labeled a staff assaulter (*Id.*).

Diaz wrote Warden Anthony Wills, alerting him to his living conditions, abuse, and his inability to obtain medical care or wash off the chemical spray (Doc. 1, p. 7). He notes that his family also called to inform Wills of Diaz's condition (*Id.*). He also wrote grievances, but Wills never responded.

On May 1, 2024, Diaz learned that he had been found guilty of three disciplinary reports (Doc. 1, p. 7). The reports were left outside of his cell with no date of service or names of the issuing officers and hearing investigators (*Id.*). Diaz alleges that he did not receive a hearing for these reports, nor was he allowed to present any statements or witnesses (*Id.*).

In July 2024, Diaz's mental health again began to deteriorate, and his family called Menard and other officials, trying to seek help for Diaz. Diaz declared a hunger strike (Doc. 1, p. 7). Diaz informed Officer Reichert that he lacked access to recreation (*Id.*). He also informed him of the disciplinary reports, his previous conditions of confinement, and the assaults he previously experienced (*Id.*). Reichert responded that he did not care about Diaz's issues (*Id.* at pp. 7-8). Diaz continued with his hunger strike and committed acts of self-harm until July 29 or 30 when he fainted in front of Reichert while he was conducting a tour with individuals from Springfield, Illinois (*Id.* at p. 8). Reichert directed that Diaz's cell be covered during the tour and Diaz was left bleeding from a headwound for an hour (*Id.*). Medical staff eventually retrieved him from the cell and sent him to an outside hospital for care (*Id.*). Diaz alleges that his hunger strike lasted 27 days (*Id.*).

During his hunger strike, Diaz spoke to Dr. Wilson and complained that she failed to help him and that her failures led to his acts of self-harm (Doc. 1, p. 8). Dr. Wilson told

Diaz to write his family and that he would die before things changed at Menard (*Id.*). Diaz also spoke to Nicholson about his living conditions in restrictive housing, including his lack of access to recreation and the abuse that led him to self-harm (*Id.*). Nicholson informed Diaz that he was not a martyr and access to the yard was a privilege (*Id.*). Nicholson noted that if Diaz wanted to die over his lack of access to the yard, then he should go for it (*Id.*). Diaz also spoke to Major Gee about his lack of access to property and how the confiscation of his property was a tool staff used to coerce him off of his hunger strike (*Id.*). He also informed Major Gee that Reichert ignored administrative directives by confiscating his property while on a hunger strike (*Id.*). Diaz threatened to continue to self-harm unless Gee brought Wills over to speak with Diaz (*Id.*). Gee refused to bring Diaz his property (*Id.*).

Diaz alleges that he wrote letters and messages to Warden Wills constantly about his lack of access to the yard. He alleges that Wills allowed all other inmates, including those in general population, administrative detention, protective custody, and receiving to attend the yard, but those inmates in segregation, like Diaz, were denied access to the yard (Doc. 1, p. 8). Diaz alleges that he remained in segregation for over five months. Diaz further alleges that Sandy Walker, Curtis Dallas, and Wills found him guilty of the disciplinary reports without notice, a hearing, or following the guidelines for seriously mentally ill inmates (*Id.*). After his hunger strike, Diaz was placed in segregation with a toilet that did not flush (*Id.* at p. 9). He contacted John Doe Sanitation Officer about his toilet but never received a response (*Id.*). He also alleges that he previously spoke to him

about other conditions (*Id.*). He wrote letters to Wills and Reichert about his toilet as well as alerted Sergeant Anthony Jones (*Id.*).

### Preliminary Dismissals

Diaz alleges that officer Bent denied his request for a shower and Reichert denied Diaz access to the yard and his property. He also alleges that Reichert directed staff to cover his cell after Diaz fainted, rather than provide him with medical care. Although Diaz refers to both Bent and Reichert as defendants in his statement of claim, he fails to identify them as defendants in the case caption. In order to be a party in the case, a plaintiff must identify them in the case caption. *See* FED. R. CIV. P. 10(a); *Myles v. United States*, 416 F.3d 551, 551–52 (7th Cir. 2005). Because Diaz fails to identify Bent and Reichert as defendants in the case caption, any potential claim against them is **DISMISSED without prejudice**.

Diaz also alleges that Dr. Wilson, Morris, and Nicholson failed to intervene in the use of force by Ruch and Alexander (Doc. 1, p. 9). He alleges that the mental health professionals also failed to intervene when Wildhaber sprayed him with a chemical agent (*Id.*). An official can be liable if they "have a realistic opportunity to step forward and prevent" another official from using "excessive force but fail to do so." *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). But there are no allegations to suggest that any of the mental health professionals were present during the incidents involving the use of force or that they had an opportunity to stop the use of force prior to its occurrence. Diaz only alleges that he informed the mental health professionals about the use of force *after* it occurred. Similarly, there are no allegations to suggest that Warden Wills had a realistic

opportunity to stop the use of force incidents as Diaz did not inform him until after the fact. Thus, Diaz's failure to intervene claim is **DISMISSED without prejudice**.

Diaz also alleges that Alexander and Ruch placed him in an unsanitary cell on suicide watch. Although Diaz alleges that they subjected him to unconstitutional conditions of confinement, he fails to allege that either officer was aware of the conditions at the time they placed him in the cell. There are no allegations suggesting that he spoke to them about the conditions or that they were otherwise aware of the cell's condition. Thus, Diaz fails to state a conditions of confinement claim against Ruch and Alexander.

## Discussion

Based on the allegations in the Complaint, the Court designates the following counts:

> **Count 1:** **Eighth Amendment excessive force claim against John Alexander and Jesse Ruch for their use of force against Diaz.**
>
> **Count 2:** **Eighth Amendment excessive force claim against Marc Wildhaber for his use of chemical spray against Diaz.**
>
> **Count 3:** **Eighth Amendment deliberate indifference to medical and mental health needs claim against Carri Morris, Dr. Wilson, Erin Nicholson, and Anthony Wills for failing to obtain care for Diaz while in the suicide watch cell and on hunger strike.**
>
> **Count 4:** **Eighth Amendment deliberate indifference to mental health needs claim against John Alexander for refusing Diaz's request for a crisis team.**
>
> **Count 5:** **Eighth Amendment conditions of confinement claim against Wildhaber, Nicholson, Morris, Wilson, and Wills for his placement in an unclean suicide watch cell and failing to decontaminate the cell or Diaz of chemical spray.**

Count 6:    Fourteenth Amendment due process claim against Major Gee and Wills for denying Diaz his access to personal property while on hunger strike.

Count 7:    Fourteenth Amendment due process claim against Sandy Walker, Curtis Dallas, and Wills for failing to provide notice, hold a hearing, or follow guidelines for seriously mentally ill inmates on the three disciplinary reports issued to Diaz.

Count 8:    Eighth Amendment conditions of confinement claim against Wills, Dr. Wilson, Nicholson Anthony Jones, and John Doe #1 sanitation officer for placing Diaz in a cell with a toilet that would not flush and denying him access to recreation.

The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. **Any other claim that is mentioned in the Complaint but not addressed in this Order should be considered dismissed without prejudice as inadequately pled under the *Twombly* pleading standard.**[3]

**Counts 1 and 2**

At this stage, Diaz alleges viable excessive force claims against Alexander and Ruch in Count 1 and Wildhaber in Count 2. He alleges that Alexander and Ruch handcuffed him too tightly, slapped his hands, and ultimately beat him after transporting him to suicide watch. He also alleges that Wildhaber walked up to Diaz's cell and sprayed a chemical agent because he heard Diaz had previously committed a staff assault. He has

---

[3] *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (an action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face").

adequately alleged that all three officers' force was used sadistically and maliciously rather than in a good faith effort to maintain discipline. *See Wilborn v. Ealey*, 881 F.3d 998, 1006 (7th Cir. 2018) ("Correctional officers violate the Eighth Amendment when they use force not 'in a good faith effort to maintain or restore discipline,' but 'maliciously and sadistically for the very purpose of causing harm.'") (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)). Thus, Counts 1 and 2 shall proceed.

**Count 3**

Diaz also states a viable claim against Morris, Dr. Wilson, Nicholson, and Wills for the failure to obtain mental and medical care for Diaz. He alleges that he informed the mental health professionals of his mental health, his exposure to chemical agents, and his self-harming behavior but they took no action. In some instances, they stated he could proceed with his acts of self-harm. Diaz also informed Wills of his need for medical care and his deteriorating mental health through numerous letters and grievances. Wills never responded to his letters. Thus, Count 3 shall proceed.

**Count 4**

Diaz also states a claim against John Alexander for his failure to obtain mental health care for Diaz. Diaz alleges that he asked Alexander on several occasions for a crisis team and Alexander refused to obtain help for Diaz. Thus, Count 4 shall proceed against Alexander.

**Count 5**

In Count 5, Diaz alleges that Wildhaber, Nicholson, Morris, Dr. Wilson, and Wills were aware of the conditions in the suicide cell but failed to take any action. He informed

Nicholson, Morris, and Dr. Wilson directly about the conditions in his cell and about the need to clean off the chemical spray after Wildhaber sprayed him. But none of the mental health staff sought to help him with the conditions. He also wrote letters to Wills to no avail. Finally, Diaz alleges that Wildhaber knew that the cell and Diaz were still covered in chemical spray, but Wildhaber returned him to the cell and confiscated his mattress. At this stage, Diaz states a viable conditions of confinement claim in Count 5. *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008).

**Count 6**

In Count 6, Diaz alleges that he was denied access to his property while he was on a hunger strike. Diaz alleges that his due process rights were denied by Major Gee who refused to return the property while he remained on hunger strike. Diaz further alleges that he wrote to Wills about his access to property. To state a claim under the due process clause of the Fourteenth Amendment, a plaintiff must establish a deprivation of liberty or property without due process of law; if the state provides an adequate remedy, a plaintiff has no civil rights claim. *Hudson v. Palmer,* 468 U.S. 517, 530-36 (1984) (availability of damages remedy in state claims court is an adequate, post-deprivation remedy); *Murdock v. Washington*, 193 F.3d 510, 513 (7th Cir. 1999). The Seventh Circuit has found that Illinois provides an adequate post-deprivation remedy in an action for damages in the Illinois Court of Claims. *Murdock,* 193 F.3d at 513; *Stewart v. McGinnis,* 5 F.3d 1031, 1036 (7th Cir.1993); 705 ILCS 505/8 (1995). Thus, Diaz's due process claim regarding the loss of his property is **DISMISSED without prejudice**.

**Count 7**

"To succeed on a due process claim stemming from a prison disciplinary proceeding, an inmate must demonstrate (1) a constitutionally protected liberty interest and (2) deficient procedures attendant to the deprivation of that interest." *Ealy v. Watson*, 109 F.4th 958, 964 (7th Cir. 2024) (internal citations omitted). An inmate's liberty interests are protected by the Due Process Clause only insofar as a deprivation of the interest at issue would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). When looking at placement in segregation, both "the duration of the segregative confinement and the conditions endured" must be considered. *Jackson v. Anastasio*, 150 F.4th 851, 858 (7th Cir. 2025). A short stay in segregation, by itself, does not typically amount to an atypical and significant hardship. *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Thomas v. Ramos*, 130 F.3d 754, 761-62 (7th Cir. 1997) (two months not enough on its own); *Lekas v. Briley*, 405 F.3d 602, 612 (7th Cir. 2005) (90 days in segregation did not state a claim); *Croom v. Schoenbeck*, App. No. 24-1875, 2025 WL 957898, at *2 (7th Cir. March 31, 2025) (three months in segregation with access to recreation twice a week, but no tablet, television, commissary food, or cleaning supplies does not implicate a liberty interest).

Diaz provides limited allegations as to the discipline he received and the conditions he experienced in segregation. He alleges that he was on crisis watch from April 8 – 18, 2024, then placed in segregation, and then went on a hunger strike in July 2024 (Doc. 1, p. 7). Although he does not clearly state how long his term in segregation lasted as a result of his disciplinary reports, Diaz at one point alleges that he went without

11

access to the yard for over five months (*Id*. at p. 8). Further, he fails to offer details about the conditions he faced in segregation. He describes the conditions in his crisis watch cell, but it is not entirely clear that he was in disciplinary segregation at that time. He alleges that when he transferred to North 2 segregation, he lacked access to recreation (Doc. 1, p. 7). But five months in segregation with limited or no access to the yard, on its own, fails to rise to the level of atypical and significant. *Hardaway v. Meyerhoff*, 734 F.3d 740, 744 (7th Cir. 2013) (six months in segregation on its own is not atypical and significant); *Lekas*, 405 F.3d at 605, 610-612 (inmate in locked cell, barred from participating in programs or accessing the yard) (citing *Thomas*, 130 F.3d at 757-58). He alleges that after coming off of the hunger strike, he was placed in a cell with a toilet that did not flush, but it is unclear how long he remained in this cell or when he was released from segregation. Without more, Diaz simply fails to allege that the conditions he faced in segregation implicated a liberty interest. Thus, Count 7 is **DISMISSED without prejudice**.

**Count 8**

Diaz also alleges that several officials were deliberately indifferent to the conditions in his cell in North 2, including his lack of access to recreation and the issues with his toilet. As to Dr. Wilson, Diaz merely alleges that he spoke to Dr. Wilson while on the hunger strike about her failure to help him with his mental illness and how her failures led him to self-harm. He fails to allege that he spoke to her about his specific living conditions in his cell at that time. He alleges that he spoke to John Doe Sanitation Officer and Sergeant Jones about his toilet, but he fails to allege when he spoke to them

and their response, if any (Doc. 1, p. 9). Thus, Diaz fails to state a claim against Dr. Wilson, John Doe Sanitation Officer, and Sergeant Jones.

Turning to Warden Wills and the issue with Diaz's toilet, he alleges that he wrote to Wills but it is not clear when Diaz wrote to Wills, what he included in his correspondence, and whether Wills received and responded to the correspondence. But as to Diaz's ability to access the yard while he was in segregation, Diaz alleges that Wills was made aware of his lack of access to the yard through Diaz's letters, grievances, and conversations that his family members had with Wills. Further, he alleges that it was Wills, as warden, who allowed other units access to the yard, but denied the segregation unit access to the yard. Finally, Diaz alleges that he directly spoke to Nicholson while on hunger strike about his lack of recreation and she told him that access was a privilege. She also warned him that he could die, but he still wouldn't get access to the yard. At this stage, Diaz states a viable claim against Wills and Nicholson as to his access to recreation.

## Disposition

For the reasons stated above, Count 1 shall proceed against John Alexander and Jesse Ruch. Count 2 shall proceed against Marc Wildhaber. Count 3 shall proceed against Carri Morris, Dr. Mary Wilson, Erin Nicholson, and Anthony Wills. Count 4 shall proceed against John Alexander. Count 5 shall proceed against Wildhaber, Nicholson, Morris, Wilson, and Wills and Count 8 shall proceed against Nicholson and Wills. Counts 6 and 7, as well as all other claims and defendants are **DISMISSED without prejudice.**

The Clerk of Court shall prepare for John Alexander, Jesse Ruch, Marc Wildhaber, Carri Morris, Dr. Mary Wilson, Erin Nicholson, and Anthony Wills: (1) Form 5 (Notice of

a Lawsuit and Request to Waive Service of a Summons) and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the Complaint, and this Memorandum and Order to each defendant's place of employment as identified by Diaz. If a defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on that defendant, and the Court will require that defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If a defendant can no longer be found at the work address provided by Diaz, the employer shall furnish the Clerk with the defendant's current work address, or, if not known, defendant's last-known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Complaint and shall not waive filing a reply pursuant to 42 U.S.C. Section 1997e(g). **Pursuant to Local Rule 8.2, Defendants need only respond to the issues stated in this Merit Review Order**.

Because Diaz's claims involve his medical and mental health care, the Clerk of Court is **DIRECTED** to enter the Court's standard HIPAA Qualified Protective Order.

If judgment is rendered against Diaz, and the judgment includes the payment of costs under Section 1915, he will be required to pay the full amount of the costs, regardless

14

of whether his application to proceed *in forma pauperis* is granted. *See* 28 U.S.C. § 1915(f)(2)(A).

Finally, Diaz is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than **14 days** after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

**DATED: May 5, 2026.**

*/s/ Reona J. Daly*
**REONA J. DALY**
**United States Magistrate Judge**

### Notice to Plaintiff

The Court will take the necessary steps to notify the appropriate defendants of your lawsuit and serve them with a copy of your Complaint. After service has been achieved, the defendants will enter their appearance and file an Answer to your Complaint. It will likely take at least **60 days** from the date of this Order to receive the defendants' Answer, but it is entirely possible that it will take **90 days** or more. When all the defendants have filed Answers, the Court will enter a Scheduling Order containing important information on deadlines, discovery, and procedures. Plaintiff is advised to wait until counsel has appeared for the defendants before filing any motions, to give the defendants notice and an opportunity to respond to those motions. Motions filed before defendants' counsel has filed an appearance will generally be denied as premature. **Plaintiff need not submit any evidence to the Court at this time, unless specifically directed to do so.**